The last case is Leica Microsystems v. Regents of the University of Michigan, 2022-1445. Mr. Sommer. Thank you, Your Honor. May it please the Court, Andrew Sommer on behalf of Appellant Leica Microsystems. The Board legally erred in its obviousness analysis by myopically focusing on the teachings of the reference to the exclusion of evidence of what the person of ordinary skill in the art would have brought to bear on the teachings of the references that were used in the obviousness combinations. We know this because the Board told us our analysis turns on the references' teachings rather than considering some of the factual evidence that we put in front of the panel before the PTAB. The Board also erred in trying to justify its finding of a lack of motivation to combine on two erroneous fact findings. The first was that the full-stance system had too short of a capture time to measure fluorescence, particularly the fluorescence from the Whitmer's House sample. Your Honors, that is unsupported by the record. I don't think the University actually can test that in its brief. What's the claim construction here of the system? I mean, you seem to be arguing at times that there's certain kinds of samples which could have been, where fluorescence could have been measured by the full-stance system within the parameters of the detection times specified there. But is that sufficient, or does the system have to be able to, as a general matter, detect fluorescence in any sample? Your Honor, I think we would submit that this system can detect the fluorescence of any sample. Whether it could detect the entire lifetime of the fluorescence may be a matter of debate, depending on the settings of the street camera. Our position before the... The fact that it could detect one sample is not enough to render it obvious. Well, we think it absolutely would be. I mean, any teaching in the prior art could meet the claim. In terms of whether it could detect all fluorescence from all samples, we don't think that that's actually required by the claim. Didn't the board find that Fulstead doesn't disclose fluorescence at all, and wasn't there substantial evidence to support that finding? We do not argue that Fulstead does disclose fluorescence, Your Honor. So, yes, absolutely. Fluorescence is not mentioned in Fulstead. That's undisputed on the record. However, that jump from detecting scattering to detecting fluorescence is trivial in light of the evidence on the record, which is the same systems were used to measure both scattering and fluorescence commonly by those skilled in the art. Both experts agreed. Both experts had done it. Additionally, the evidence showed... The evidence included a 1973 textbook showing the position of a fluorescer or a scatterer in the same system. There was an article by Jameson, this is at Appendix 1824, that shows that people skilled in the art were using things like turret assemblies to move scatterers and fluorescers. Of course, the board had all this evidence in front of it, had the two experts' analyses of the evidence, and found that the patent owner's expert was more persuasive as to what would be known to one of skilled in the art. Isn't that all substantial evidence? Your Honor, we disagree that that's a fact finding that the board made, that there was a credibility determination that Dr. Piston was more credible on what one of ordinary skilled in the art would know. I think it's important to note that in the patent owner response, there's four pages dedicated to the entirety of the Fulstead ground. There's one paragraph directed to motivation to combine in the patent owner response to the petition. That is that the board got it right for the reasons we've already explained in our report of that analysis. It wasn't presented to the board as Dr. Piston provided a detailed explanation of why one of ordinary skilled in the art would not have been motivated. The board has more than a paragraph. The board goes on for pages and pages about why they are not persuaded. I don't think they have to make a credibility finding. They need to make a finding as to who persuaded them. They were clearly persuaded, as they explain at length, by the patent owner. Isn't there substantial evidence to support that? Your Honor, the actual subsidiary fact findings made, for example, to say that the differences were substantial between the purpose of Fulstead on one hand and then the claim on the other are not supported by substantial evidence first. As to the timing, Whitmer's house and Fulstead was a combination presented to the board. There would need to be no adjustment to the timing of the capture fully of the fluorescence of Whitmer's house's sample. So the board's conclusion that there would have had to be... Let's assume, for the sake of argument, the board got that one fact finding, but only that one fact finding, wrong. Would that mean we have to reverse or we have to remand or could we not still affirm based on the other findings? Well, the other finding was that there was a level of expertise required to prepare the Your Honor, that's not relevant to the claims. There is no specific testing. There is no specific sample preparation being discussed in those claims. So no, we don't think that that's a basis for affirming the board. We think that that is kind of a red herring, if you will. And certainly the board does have a lot more explanation in its final written decision responding to our motivation to combine than is in the patent owner response. But because this issue wasn't fully developed, the board made these factual errors trying to justify itself because they were not vetted on the record. Did the board find that the Fulstead system, a Fulstead type system would not have been used to detect fluorescence? I don't think the board made that fact finding, Your Honor. Certainly not explicitly. The board did say the differences in purpose of those two things was substantial and then tried to justify that decision by saying, look, timing is a huge consideration and the record lacks evidence of how you'd adjust the timing. Our argument in the petition was that no adjustment would be necessary. It certainly wouldn't have been in the context of the Whitmer's House reference. So basically the board is saying, even if you could use the Fulstead system to detect fluorescence, that you'd have to modify it because the normal timing in the system wouldn't detect fluorescence in a large majority of samples. I think that's a fair reading of what the board was trying to say, yes. The board also erred by summarily rejecting our argument that these claims are directed to a new use of an old system. Specifically under the law, what we have here is the functional limitations that's the discussion between the parties here. The use of the Fulstead system for exciting fluorescence of a sample having multiple fluorophores. Under the law, we don't look to the functional limitations of the claim to define what a system is. Apparatus claims define the apparatus, not what the apparatus does. And here we have a case in which the principal dispute between the parties is over whether the apparatus of Fulstead would be used to detect fluorescence. Is there substantial evidence that some modification would have to be made to Fulstead in order to practice the 169 claims? Certainly not identified by the board. What about a cryogenic holding container in order to, for instance, use samples like the one in your secondary reference? If you're going to do a full substitution of the sample holding system into Fulstead, which we don't understand the law to require, perhaps, your honor, they certainly referenced the sample preparation being cryogenic. That was for the particular experiments being performed by the Whitmer's House group when they did that. But that's not necessary for detecting the fluorescence. I guess the more general question is, if we think there's substantial evidence to support a conclusion that some modification would need to be made to Fulstead in order to practice the 169 claims being challenged, then is it fair to say that this really is just a new use of an old machine? Or is it more accurate to say it's a new use of a newly modified old machine? If so, I think the answer is it depends, your honor, and it depends on how it's claimed. Because if that distinction of what is needed to practice the claim with Fulstead is embodied within the claim itself, then yes, I'd agree. It is a new machine, a different machine. But that's not what we have here. There's an argument in the university's brief that what they've done is they've come up with a new street camera, a non-obvious modification to the street camera. That's contrary to the patent. The patent has one figure showing the details of a street camera. It is labeled in bold letters prior art. They identify a prior street camera commercially available. The manual of that street camera is found in the appendix and talks about how the timing can be controlled on that street camera. The whole contention about non-obviousness concerns the detection aspect of this and not the light initiation aspect of it, correct? Your honor, yes. I think there's a slight interrelation of those two things as to the timing aspect of the board's decision. Because if the pulses are too close together, it'll be just a wash of light, for example. But yes, in general, I think the primary dispute is over detection. Okay. So what does the record show about how you would set the camera for different detection periods? Well, so if you had to set the camera differently than Fulstad, which is something that we don't agree with, at least in the context of Whitmer's House. But if you did, if you look at appendix 3164, there's a discussion. This is a piece of evidence about a Hamamatsu street camera that's discussed in both Fulstad, discussed in the patent as well. It talks about a gate operation that renders the street camera temporarily insensitive. This is under the bold letter gate. And this is exactly how it was done. We've included another article in the record as well that talks about gating, which is you wait until the light front that you don't want to measure goes by, and then you activate the camera and you capture what you do want to capture. This is the instructions for the manual, or the street camera that's at issue. So there is no non-obvious modification to a street camera. This is how they work. I mean, the problem is there seems to be some confusion in the record as to what timing issue we're concerned about, whether it's delaying the start of the measurement, whether it's the period of measurement. It's confusing to me as to what the board is talking about and what the parties are talking about. They seem to be going past each other to some extent. Your Honor, I don't completely disagree with that, but I think at the end of the board's analysis of the entire timing section, I think is kind of the nut of where the issue lies, which is that they found that there would have to be some adjustment. And while that may be true in the context of the merit... Adjustment to the period in which the detection takes place or some adjustment to the delay of the start of the detection period? I think a fair reading of the board's opinion is that they found perhaps both might need to be adjusted and that there would need to be precise timing changed with Fulstad. But we think that that is kind of where the error lies. That is the central error in the fact finding on the first point, because no change is necessary. That's what we argued in the petition. It's what we've argued in the brief. And I believe that that is uncontested in the university's briefing. Counsel, you're onto your rebuttal time. You can continue or save it. Thank you, Your Honor. I'll save the rest of my time for rebuttal. Mr. Tonkovich. Good morning, Your Honors. So the sole issue in this appeal, the sole board finding in relation to Fulstad and Whitmer House is no motivation to combine. The board did not go on to analyze whether or not the references disclosed particular limitations of the claims. They stopped at there was no motivation to combine these references. And that's a specific issue that's actually on appeal here. Although I think much of the argument goes into whether or not the combination shows certain limitations. And I'm happy to address that as well. But there's more. If the board misunderstood what Fulstad is, that would certainly in fact, its motivation to combine analysis, wouldn't it? It would, but that's not what happened here. The board understood Fulstad absolutely perfectly. Okay. But I mean, to say it's motivation to combine doesn't absolve you or the board from if they made errors, for instance, about whether timing needed to be adjusted. If they made an error there, you agree, I think that has to affect their motivation to combine analysis, doesn't it? Sure. There was no error in terms of the timing and I'm happy to answer any questions. I would like to understand how that was not an error. Yes. Okay. So when the board is explaining the timing, what it's talking about is it says that Fulstad has a femtosecond laser and then it says that it takes a measurement for a period of one to two nanoseconds. Are we at around a 16 and 17 thereabouts? Yes. So if I'm looking on page 17, and it says Fulstad teaches in the first full paragraph, a repeating laser pulse, the length of each pulse in the order of femtoseconds, and that is being adopted from the expert declaration, and with a street camera taking measurements two picoseconds apart for a matter of one to two nanoseconds. And this is perfectly consistent with what's disclosed in Fulstad at appendix page 636. But then later on on that same page, they say that Marriott's Ecrodim orange dot exhibits prompt fluorescent times of 1.7 to 1.9 nanoseconds, which would seem to be within the Fulstad capability. Yes, that is a period of fluorescence. So that's a problem, because the board's own finding seems to be that at least in detecting this sample, that the Fulstad machine could have done it. Well, it couldn't have done it. And here's the issue. So what Fulstad says and what the board's alluding to here... Is my reading of that correct? That they're saying that it's... In terms of timing, they're saying that that particular sample could have been used to detect fluorescence using Fulstad. Well, I just want to explain why that would not actually work when you get into the references. And so if you just bear with me for a second... Okay, bear with you. So the timing is right, but something else is wrong. Is that what you're saying? The timing actually doesn't work in the context of the Fulstad system for fluorescence detection. Here's why. So what Fulstad tells us on appendix page 696 is that the propagation time from the white light laser to the detector is up to about two nanoseconds. That means your white light excitation light takes two nanoseconds to go from the laser to the detector. If you have fluorescence at that same time, you will not be able to detect it. The laser excitation light is brighter than the fluorescence. So you won't be able to detect it if they're in the system at the same time. Every reference we have in the record, Laporte, Marriott, the patent itself, there has to be some spacing between the excitation light and the fluorescence in order to detect it. And even with regard to Whitmer's house, Whitmer's house shows fluorescence on the order of... So where does the board say that Fulstad doesn't show a sufficient delay? The board, to me, seems to be talking about the detection period. And now you're arguing something which seems to be different, which is that it wouldn't work because Fulstad doesn't disclose the necessary delay in the start of the detection period that would eliminate the effect of the light overcoming the fluorescent light information. So what the board finds is that... Do you understand what I'm saying? I don't exactly. I'm sorry. That would be a problem. I apologize. My understanding of what you're saying now is that it wouldn't work because Fulstad doesn't show enough delay in the start of the detection time. And that because of that, the light source would make it impossible to read the fluorescence. And do I understand that correctly? That's what you're saying. It wouldn't work because there's not enough delay in the start of the detection period? Yes. The two time periods are overlapping. If the laser propagation time and the fluorescence are overlapping, we'll be able to detect the fluorescence. There's clearly not any separation that's required. Okay. So I'll take that as a yes. But in reading the board's decision, I don't see that they're talking about that. They seem to be talking about the period of detection rather than the necessity for a delay in the start of the detection period. I think the point the board is making is that in the prior art, it shows very particular specialized timing in terms of how to detect fluorescence. And that there's no teaching anywhere of how you would use Fulstad to adjust it to the correct timing. This is 17 to 18. The record lacks any evidence regarding how... Which correct timing? What? Which correct timing? I mean, as I was mentioning earlier, it seems to me there's confusion here because people are talking about different timing limitations. The start of the detection period being one, which you just talked about, and the other one is the length of the detection period. Yes. And what the board appears to be talking about is both. It says, the evidence record reflects very specialized, precise measurements for the detection of fluorescence. The record lacks evidence regarding how Perseverance still would have configured Fulstad's systems to measure fluorescence. I read that to include... Getting back to your original point, there was no motivation to combine these references. Why wasn't there a motivation? Because these are all directed to testing methods. And so, why couldn't one take Whitmer's house that dealt with fluorescence and combine it with Fluorestand? Well, so, for a few reasons. One is, they're two completely different analytical technologies. The idea of measuring scattered light and their propagation times, and using that to find information, as Fulstad said, about concentration, homogeneity of a turbid sample, is very different than looking at the fluorescence of a sample. I mean, what the board found is a state of the art is, has very specialized, expert-level disclosures... Did the board find that you wouldn't use both pieces of equipment to both detect scattering and fluorescence? There's no evidence to the record of anybody actually using both of those. Even more specifically... I don't think that's correct. I think there is a lot of evidence that people use the same equipment. Okay, so let's talk about that for a second. I mean, the board found that Doc Nox's testimony was conclusory on the issue of swapping samples, particularly swapping a fluorescent sample into a scattering measuring device. And the board found no evidentiary support for that. And we can talk specifically about the two articles that they cite, the 1973 book and the 1984 article. So, very specifically, what they're actually alleging here is that you're going to take a fluorescent sample and you're going to put it into a scattering machine. Right? That's what they're alleging. There's not a single instance in the record of anybody ever doing that, of anybody ever taking a fluorescent sample and putting it in a detection machine. In other words, you would put in a slide or could go without your sample and you determine what scattering or background noise there is in the machine so you can reduce that. That's about calibration of the fluorescent detection machine. I think their argument in response to that is that the claims are not limited to detection versus calibration. Are they right about that? The claims of the patent are about fluorescence detection. And so calibration would not practice any of your claims? That is true. There's also not a single example of anybody putting a fluorescent sample in a scattering machine to measure fluorescence, which is really the key issue here. They were not able to find any example in the literature of anybody ever doing that. And that's a key issue that I think the board seized on in providing no real evidentiary support, the idea that swapping samples was simple. I mean, even Dr. Piston testified that even today, the scattering and fluorescent machines are still separate. The separate machine is used for separate purposes. So if we were to conclude otherwise, that there was substantial evidence that the same machine was used for both, we'd have to send it back to the board, right? Well, I mean, there are certainly other factual findings that could support the lack of motivation to combine here. Well, could support, but we've got to deal with what the board did decide. Oh, no, I'm talking about indeed what the board actually did decide here in terms of the lack of evidentiary support for swapping samples. The fact that the state-of-the-art, in fact, of very specialized, precise measurements of fluorescence, and there's just no teaching in the record of how you would configure FullSTAT to do that. That was a factual finding that the board made as well. They found no evidence of improvement in using FullSTAT's system, as opposed to using Wittmerhaus' system, which was specially designed to measure the fluorescence of the Wittmerhaus sample. They further found that in order to do this combination, you have to completely disregard the teachings of Wittmerhaus with regard to fluorescence, and just in favor of FullSTAT, which has no disclosure of fluorescence. So there's several other factual findings that the board made that would support lack of motivation to combine as well in the record. What if, going back to the timing question, what if we found that the board had no substantial evidence for its timing analysis? Where would that leave us? Could we still affirm, or would we need to reverse or send back? I think you could still affirm based on the other factual findings that one would not have combined these. In other words, one would have to disregard, really, all the questions of Wittmerhaus in order to do this, and that there was no real evidence of swapping of samples. I think there are other factual findings in the record that would support finding no motivation to combine. That there was no benefit or improvement in using FullSTAT's system to test Wittmerhaus samples is another factual finding that would support it. What's your response on the camera manual that it basically discloses how to change the settings on the camera to do what your patent does? Oh, sure. The camera manual that I cited was from 2008, two years after the patent was filed. So it was actually not demonstrating the knowledge and skill of the art at the time. Nor is there anything in the record suggesting any modifications of a street camera in order to do what the patent does, which is separate white light excitation from fluorescence. Nothing in the record, no teaching at all. And the manual they cite, again, is well after the patent. So as I said, it doesn't show the knowledge of skill in the art at the time. It's after the patent, but are you conceding that it does disclose what your patent does? No, I'm not conceding that it does disclose it. I mean, it discloses different features of the camera, but how you would use those, how you would configure it, none of that is disclosed in the manual. Anything further? No, not unless the Board has any more questions. Thank you, Counsel. Mr. Salma has some bottle time. Thank you, Your Honor. Help me here. I had thought that you had evidence that the same machines were used to detect scattering and fluorescence. They say, no, it only happened for calibration purposes and not detection purposes. Help us understand what the record says. So, Your Honor, two points on that. One, I believe there was a claim construction argument that said detection does not include calibration. Well, there's testimony in the record from Dr. Piston, their expert, that said what they did was, this was the question, would it be fair at one point in time, the scattering solution is in the beam path and you're taking measurements based on the scattering solution and then you can rotate the turret and put the fluorescence sample in the beam path? Answer, yes. So that's what he was doing in the 1980s. Where, what's this? I know you shot it, but what's it? Appendix 3904 and Appendix 3905, Your Honor. In terms of the other evidence in the record on this point, there's quite a bit of it. Now, some of it is with respect to calibration of the system by swapping out the sample and you want to remove some noise or some delay times. But that's not the limit of it. There is a reference to a Georgia county, and I believe it was originally exhibit 1035 in the IPR proceeding. I'm looking for it here in my appendix materials. But this one talks about the aim of this study was to assess the potential of three spectroscopic techniques, fluorescence, reflectance, and light scattering spectroscopy. And it describes the use of all these techniques in the same system. So the evidence is not that... Is calibration within the scope of the claims or not? It's detecting, yes. Absolutely. It detects the optical phenomena in order to perform calibration. There's no distinction in the claims that you have to detect for a particular purpose. And you suggested there was a claim construction dispute. Did the board resolve it? I don't think it was ever presented to the board. It was the first time I heard about it today that somehow calibration does not fall within the scope of detecting it. The timing issue. Just one last thing. I see I'm running out of time. I heard an argument today that the timing wouldn't work because the delay of propagation of the scattered photons through the sample would have been too much noise. It would have conflicted with the Whitmer's house excitation and fluorescence. The pill is no longer there once you've swapped out the sample. So you're not dealing with the turbid pharmaceutical media anymore. You're dealing with the consequences of using a sample like a spinach chloroplast solution that was prepared. And exactly how that would look in time-resolved detection can be found on page 197 of the appendix. You can distinguish between all of the different fluorophores and the light from the excitation source. With that, thank you very much, Your Honor. Thank you to both counsel and cases submitted. That concludes the arguments for today.